CHISHOLM et al. v. THE STEAMER ALEX. FOLSOM and THE SCHOONER MARY B. MITCHELL, etc.

*(District Court, N. D. Ohio, E. D. January, 1891.)*

COLLISION—IN NARROW CHANNEL—SUCTION—TOW UNDER SAIL.

The steamer Devereaux and the steamer Folsom, with the schooners Mitchell and Nelson in tow, were passing to the starboard of each other in a narrow channel, where it was necessary that they should proceed slowly and cautiously. The force of suction gave the Devereaux a sheer to starboard, and across the course of the

Mitchell, just as the Devereaux's bow passed the stern of the Folsom, whereupon her helm was put hard a-starboard, and her speed increased, to swing her to her course, and the maneuver was partially successful, but the Mitchell took a sheer to starboard just at this time, and the Devereaux struck her on the port bow. The speed of the Folsom and her tow was at least seven miles an hour, and both the schooners in tow had all sail set, with an eight to thirteen mile breeze on the quarter. *Held*, that the collision was caused by the negligence of the Folsom in running at an excessive speed, and with her tow under sail, and to that of the Mitchell in not anticipating the result of suction on the Devereaux, and in not swinging to port to avoid her.

In Admiralty.

*H. D. Goulder*, for libelants.

*F. H. Canfield* and *Sherman, Hoyt & Dustin*, for respondents.

RICKS, J. The libel in this case charged that on the 13th day of August, 1890, the steamer J. H. Devereaux, properly manned and appointed, was bound on a voyage from Marquette, in the state of Michigan, to Cleveland, had proceeded on said voyage as far as the natural channel below the dredged cut in Lake George in the St. Mary's river, and at about 7:20 o'clock of said day she came in collision with the schooner Mary B. Mitchell. The Devereaux was proceeding down the channel cautiously, and at a low rate of speed, when she saw approaching the Folsom, having in tow the schooners Mary B. Mitchell and Nelson. All three of said tows were carrying their sails. The Folsom blew a passing signal of one blast. The Devereaux answered with a signal of two blasts, which was accepted by the Folsom with an answer of two blasts. At this time the vessels were more than half a mile apart. The vessels thereupon approached each other, each in its proper course for passing. The channel was narrow and dangerous. Good seamanship required that the vessels should proceed under check, at a low rate rate of speed, to avoid suction. The libelants aver that as the Folsom passed the Devereaux, by reason of her great speed, the position of the vessels in such a narrow channel caused the Devereaux to sheer out to starboard; and immediately the helm of the Devereaux was put hard a-starboard, and her speed increased, for the purpose of making her swing back into her proper course, which maneuver was successful. The Devereaux began rapidly swinging back to port; but, although a signal had been blown to the Folsom to check down, yet they aver that the Folsom continued her reckless speed, and the Mitchell did not steer to the westward, but came up towards the course of the Devereaux, presenting her port bow ahead of the Devereaux, seeing which the latter reversed and backed with all the power of her engines, and while so backing collided with the Mitchell's port bow. The principal allegations of negligence are that the tow was carrying sail, and proceeding at too great speed through the channel, thereby causing suction. The answer denies the charges in the libel, and claims that, when the propellers were about abreast of each other, the Devereaux negligently changed her course, and suddenly swung to starboard, in a course which would have carried her across the bows of the Mitchell; that, upon seeing this change of course, the engine of the Folsom was stopped, and the Devereaux, without prop-

erly checking, or making any proper effort to avoid collision with the Mitchell, came on, and struck said schooner's bow, doing her great damage in the manner stated.

This brief statement of the issues made by the libel and answer brings us to a consideration of the facts as developed by the testimony. There are certain facts which are either conceded, or so overwhelmingly established by the testimony that they need merely to be stated: *First*. That the channel or natural cut in which this collision occurred was a place requiring great care and prudence on the part of the masters and crews of passing vessels. It was a place where the speed of vessels should be moderate, where the master and crew should be on deck and vigilant, and the vessels in such condition as to be easily handled and controlled. *Second*. That the vessels approached each other in this channel on the day named, and exchanged signals which were well understood and accepted by both parties. *Third*. That each took her proper course, and, until abreast of each other, both were going in a direction which would have enabled them to pass in safety. All the witnesses substantially concur in the statement that when the Devereaux was abreast of the Folsom she took a sudden sheer to starboard, which threw her temporarily into the pathway of the Mitchell. The witnesses vary as to the relative position of the two steamers when this sheer took place, as to how much the Devereaux changed her course, and as to how far she recovered her position when the collision took place. It appears to the court that the preponderance of evidence fully establishes that the Devereaux did not sheer until her bow had passed the stern of the Folsom some little distance, and that the sheer was not caused by any voluntary change of course on the part of the vessel, through the management of her wheel and rudder, or that her previous course, as claimed by the captain of the Folsom, in any way caused her to sheer at the particular moment described. The width of the channel, the depth of the water, the speed of the vessels, according to the clear preponderance of the testimony of the expert witnesses, were all favorable to cause that peculiar, dangerous, but not uncommon, force, commonly called "suction." It is not necessary here to undertake to explain what causes such force. It is sufficient to say that it seems to be a danger very common to vessels passing at such places, and one which all prudent navigators should anticipate and do their utmost to guard against. The sudden and violent sheer of the Devereaux cannot be accounted for upon any other theory. There is not only no testimony tending to show that it was caused by any improper management of her wheel at the time, but it is hardly probable that such a movement could have been brought about by any improper handling of the vessel, if her officers had undertaken it. There seems to be a clear and well established preponderance of evidence that the force of the waters under such circumstances frequently acts upon vessels just as it did upon the Devereaux in this case, and that the sheer of the vessel in itself was not due to any fault or negligence on the part of her master. The only question in the opinion of the court is whether the Devereaux was properly handled both in preparing for such a sheer,

and in directing the course and movement of the vessel after its force was apparent. The captain says that as soon as he began to notice the tendency of the vessel to sheer he at once put his wheel hard starboard, signaled the engineer to give her a quick move forward, and, with the aid of this movement, and relying upon the same natural force of the waters on the stern of the vessel as it came within reach of this suction, hoped she would straighten up and regain her course in the quickest possible manner. But it is claimed that, instead of propelling his vessel forward with greater speed and force, he should have checked and reversed, and thereby have lessened the speed of his vessel, the probabilities of a collision, and the force of a blow if the collision was inevitable. This is purely and entirely a question of seamanship, and I have submitted it to the nautical assessors, with the result to be hereinafter stated. The evidence clearly shows that, whether the captain took the best possible course or not, his handling of the vessel resulted in speedily straightening her, and bringing her nearly back to her original course.

We will leave the Devereaux at this point, and proceed to consider the allegations of negligence charged against the Folsom and her tow. The first and most important allegation to determine in this connection is the speed at which the Folsom and her tow were proceeding up that narrow channel. There is a good deal of conflict in the testimony upon this point, but, with certain controlling facts established, it is not difficult to reach a satisfactory conclusion. The Folsom and her tow started that morning from their anchor at a point from the mouth of the channel varying, according, to the testimony of the witnesses, from two to three miles, and at a time about which the witnesses somewhat differ. The time when the vessels started and the distance they traversed are two very important facts, because they determine the question of speed. There is no substantial variation in the testimony as to the hour when the collision occurred. It is contended on behalf of the defendants that the speed of the Folsom and her tow could not have been as great as the libelants aver, because the distance they traveled and the time occupied clearly show that their speed was not dangerous, or as great as charged. The counsel for the defendants contend that the distance traveled was but 14 miles, and the time occupied 3 hours, which would make the speed less than 5 miles an hour. The nautical assessors have kindly made a careful calculation from the charts and government maps of the distances, and have submitted them to me as follows:

| | |
|---|---|
| Can in Mud lake to sailor's encampment, | $3\frac{3}{4}$ miles. |
| Across bend to the other government mark, | $\frac{3}{4}$ " |
| Bend to Dark hole, | $1$ " |
| Dark hole to foot of Sugar island, | $3\frac{1}{4}$ " |
| Crossing at foot of island, | $\frac{3}{4}$ " |
| To Rain's dock, | $1\frac{1}{2}$ " |
| Rain's dock to Nebish rapids, | $\frac{3}{4}$ " |
| Through the Nebish, | $\frac{1}{4}$ " |
| Foot of Nebish to first red buoy, | $1\frac{1}{4}$ " |
| First red buoy to lower red can, | $1\frac{3}{4}$ " |
| From red can to point of collision, (estimated,) | $\frac{3}{4}$ " |

Deducting overreaches at three-fourths of a mile, leaves fifteen miles from the can in Mud lake to the point of collision. The distance from the place where the tow started in the morning to the can in Mud lake is placed at from two to three, miles, so that the least possible distance traveled is seventeen miles; and, giving the defendants the greatest time claimed, (three hours,) it makes the most favorable estimate of the speed possible for them at nearly six miles an hour. But the exact time at which the tow started in the morning is a fact about which witnesses may well vary from a quarter to a half an hour, depending upon the length of time required to take in sail and prepare the vessels for moving.

But there are other facts so well established that there need be no reasonable doubt as to the speed at which these vessels were going. We have the testimony of thoroughly disinterested witnesses, who followed in the rear of this tow, within reasonable distance. The speed at which they were moving is a matter about which they can have no reasonable doubt. The velocity of the wind is also a fact very satisfactorily established by purely disinterested witnesses, and, taking all these things into consideration, the conclusion of the court as a question of fact is that the Folsom and the tow just before the collision were proceeding up this channel at a rate of between six and seven miles an hour. I think this is a very reasonable and fair estimate. I think the court might well find that the rate of speed was even greater than this. The fact that the tow carried sail is substantially conceded, but it is denied that the force of the wind was such as to make these sails draw, or make the vessels less easily handled. As to the force and direction of the wind, we have the testimony of Capt. Malloy and Mate Scott of the Winslow, Mate Mc-Corquodale of the Harvey Brown, Capt. Smith and Mate Millson of the Northern Queen, Joseph Duncanson and Wheelsman Balfour of the Hackett, Capt. Girardon, and Capt. Stone. These witnesses all concur in the fact that there was a stiff breeze blowing substantially S. to S. E. They vary the velocity of the wind at from eight to thirteen miles an hour. Even at the lowest estimate, with the wind from the direction stated, the sails of the tow must have been pulling, and must have accelerated their speed. Sailing in these waters under such circumstances, the direction of the wind and the speed of the vessels considered, was certainly a very exceptional circumstance, and an act of almost criminal recklessness and folly. Many of the oldest masters who have testified in this case say they never saw vessels under sail in that channel under the same circumstances. When the master of the Folsom, with full knowledge that his tow was under sail, the full force of the breeze, and its direction, deliberately took upon himself the peril of navigating that channel under those circumstances, he of course assumed all the risk incident to such a rash act. We have no hesitation in saying that in so doing he was guilty of gross negligence.

The only question left is whether this negligence was the direct and proximate cause of this collision, and whether the Devereaux was without fault, under the circumstances heretofore stated. It is too evident a proposition to need more than mere statement that the vessels, proceed-

ing with their sails drawing, with the wind at the velocity named, and from the direction stated, were not in condition to be properly and skillfully handled in case of peril. The sails pulling under such circumstances would increase the speed, would cause the vessels to lose headway in less time in case of danger, would cause them to luff, would prevent the wheelsman from seeing ahead with ease and certainty, would make the management of the wheel more difficult and laborious, and the increased care and vigilance required in an emergency would add to the demoralization and excitement incident on board a vessel under such circumstances. In this instance, even conceding that the Folsom checked her speed, as claimed by the captain, his movements could not have affected the Mitchell as quickly as it would have done if she had not been under the force and influence of the sail. That the Mitchell was more unmanageable because of the sail under these circumstances, and that she actually sheered to her starboard about the time she was struck, which sheering was undoubtedly caused by her unmanageable condition on account of her sail, is shown by the testimony of two disinterested witnesses, Joseph Duncanson and Mr. Balfour, of the Hackett, who, while at some distance away, were yet in a very favorable position to observe the movements of the vessel, and who positively swear that they specially noticed that the Mitchell did sheer. In this they are supported by the testimony of Capt. Gilmore, Mate Cleveland, Wheelsman Block, and David Robb, of the Devereaux, and partially, at least, corroborated by Mate Millson of the Northern Queen, who puts the Mitchell's spars in such a range with his own vessel that she could not have been in her proper course at the time of the collision.

I therefore find, upon this branch of the case, as a conclusion of fact, that the Mitchell suddenly changed her course by sheering to the starboard. The testimony of the master of the Mitchell shows that he was not without fault in the management of his vessel. Going up the river with sail, and at the speed found by the court, he ought to have been in position to have given prompt orders to his wheelsman, so as to control the movement of his boat. A master of experience should have known that in that channel, and at that speed, two steamers passing as the Folsom and Devereaux were passing were not unlikely to sheer. He ought to have had his wheel starboarded, and his vessel in shape to have responded promptly to the movement of his wheel, and been ready to move that wheel upon the slightest indication of such a sheer. But according to his own testimony he was not in position to act promptly, and he did not. Had he done so, the collision would not have occurred, notwithstanding the sudden and violent sheer the Devereaux took.

With these conclusions of fact found by the court, and with which Capts. Kelly and Mallory, the nautical assessors who have patiently and kindly heard this protracted case with me, agree, I have taken their advice and opinion as to the expert questions of seamanship involved. We all agree that there is such a natural force in navigable waters described as "suction" by the expert witnesses in this case, and that said force would be caused by two steamers passing in that narrow channel, at the speed

and under the circumstances developed by the testimony in this case, and that it would naturally have the effect on one of the vessels as shown in the case of the Devereaux on this occasion. We further agree that the sudden and violent sheer of the Devereaux would not likely be caused by any other force or influence; and that her master, from the moment she began to sheer, directed her movements in a skillful and seaman-like manner. We further find that, while not actually anticipating such a sheer, he nevertheless had his vessel properly in hand, and ready to counteract such movement promptly. We are further of the opinion that the tendency to sheer from suction in that channel by vessels passing under the conditions of this case was well known by skillful seamen, and that the master of the Mitchell should have considered it possible, if not probable, on the part of the Devereaux, and have so far guarded against it as to have had his own vessel in perfect control, and her wheel on the starboard, so as to have headed his vessel to port, and have been able to put her in that course promptly when the emergency made it necessary. We are also of the opinion that, with the wind blowing from the direction and with the velocity heretofore stated, it was gross negligence on the part of the master of the Folsom to have towed his consorts through that channel with sails set and drawing, as hereinbefore found. We are further of the opinion that the speed at which said Folsom and tow were proceeding was too great, that it contributed mainly to cause the suction which drew the Devereaux from her course, and was the proximate cause of the collision. We are further of the opinion that the Devereaux was without fault, and was managed at the time with prudence and proper skill.

The court therefore finds that the allegations of the libel are true so far as found and stated in this opinion, and a decree will be prepared accordingly, and a reference to commissioner to hear testimony and report the damages the Devereaux has sustained by reason of the negligence and wrongful acts of the Folsom and her consort, the Mitchell.